IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | 8:07CR242 |
| v. | ) | |
| JANICE GRANT, | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |

This memorandum supplements findings made on the record at defendant's sentencing hearing on May 9, 2008. The court finds that the defendant should be sentenced to a term of incarceration of fifteen years.

**I.  BACKGROUND**

Defendant was originally charged with second-degree murder in connection with the stabbing death of her boyfriend, Erasmo Porter. Filing No. 13. The government later filed a superceding indictment, adding a count for voluntary manslaughter. Filing No. 29. Voluntary manslaughter carries a statutory sentencing range of zero to fifteen years. 18 U.S.C. §1112(b). Second-degree murder carries a statutory range of "any term of years to life imprisonment." 18 U.S.C. §1111(b).

The charges against Grant were tried to a jury from December 10, 2007 to December 18, 2007. The government tried the case under both theories, with voluntary manslaughter a lesser-included offense. At trial, Ms. Grant presented evidence that she was acting in self-defense and also presented expert testimony on battered spouse syndrome. The evidence showed that the stabbing occurred in the course of an argument between Grant and Porter. Ms. Grant testified that Porter was assaulting her.

The jury was instructed that the elements of the crime of murder in the second-degree required "malice aforethought," defined as "an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life." In the jury instruction that set out the elements of voluntary manslaughter, the jury was instructed that to find Ms. Grant guilty of that crime, it had to find that she "voluntarily, intentionally, and unlawfully caused the death of Erasmo Porter" and that she "acted upon heat of passion or sudden quarrel caused by adequate provocation," defined as provocation that "would cause a reasonable person to lose her self-control." The jury was also instructed that "sudden quarrel," as used in the instructions, "mean[t] that two persons willingly engaged in mutual combat and during the fight one kill[ed] the other as a result of an intention to do so formed during the struggle." In addition, it was instructed that "[y]ou may, but are not required to, infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." They rejected Ms. Grant's claim of self-defense and returned a verdict of guilty to second-degree murder.

The court accepted the verdict and the United States Office of Probation (hereinafter, "the Probation Office") prepared a Presentence Investigation Report (hereinafter, "PSR") that calculated the defendant's sentence under the United States Sentencing Guidelines ("the Guidelines").

In the PSR, the Probation Office identified U.S.S.G. § 2A1.2 as the applicable base offense level provision for a second-degree murder conviction. That section establishes a base offense level of 38 for the crime. U.S.S.G. § 2A1.2. The Probation Office found that Grant had numerous convictions for crimes such as shoplifting, receiving stolen

2

property, burglary, assault, theft of less than $300.00, failure to appear, driving under the influence, and negligent child abuse. However, because the sentences for these convictions were not of sufficient length to be counted under U.S.S.G. § 4A1.1(a) (exceeding one year) or § 4A1.1(b) (sixty days), only four criminal history points could be assessed under U.S.S.G. § 4A1.1(c). The Probation Office accordingly placed the defendant in Criminal History Category III. Grant's resulting advisory Guidelines sentencing range is 292-365 months.

The PSR relates that Ms. Grant also has a lengthy history of involvement in abusive relationships. She was physically and sexually abused as a child. She has been diagnosed with major depressive disorder and pos-traumatic stress disorder. Ms. Grant's history of substance abuse dates back to age 8, when she first used marijuana, and she has used marijuana, LSD, cocaine, methamphetamine, prescription drugs and inhalants. Before her arrest for this offense, she reportedly used methamphetamine daily, as well as abusing alcohol and marijuana. The government has adopted the findings in the presentence investigation report. Filing No. 98. Ms Grant objected to the findings in the PSR. Filing No. 105, PSR Addendum at 29.

Ms. Grant moved for a downward departure under U.S.S.G. §§ 5K2.0, based on circumstances not adequately taken into account by the Sentencing Commission in formulating the Guidelines, and under § 5K2.10, for the victim's conduct. Filing No. 99. She also moved for a variance or deviation from the guideline range under 18 U.S.C. § 3553(a). *Id.* She argued that there are extraordinary mitigating factors in her case, including the long-term and serious domestic abuse, threats, and assaultive acts against her by the deceased, her lack of intent to kill, her confession to law enforcement, and her

extraordinary and tangible remorse. Ms. Grant has submitted, and the court has reviewed, evidence in support of her position, including police reports, a psychological assessment, tribal court records, Omaha nation law enforcement reports, an FBI report, X-rays, certificates earned while in pretrial custody and numerous letters of support. Filing No. 102, Exhibit List.

## II. DISCUSSION

### A. Law

The United States Supreme Court has determined that a mandatory federal sentencing guidelines system violates the Sixth Amendment. *United States v. Booker,* 543 U.S. 220, 226-27 (2005) (substantive opinion). The constitutional infirmity has been remedied by interpreting the Guidelines as advisory. *Id.* at 245. Accordingly, the range of choice in sentencing dictated by the facts of the case has been significantly broadened since the *Booker* decision. *Gall v. United States,* 552 U.S. —, —, 128 S. Ct. 586, 602 (2007) (finding a sentence outside the Guidelines range was reasonable); *Kimbrough v. United States,* 552 U.S. —, —, 128 S. Ct. 558, 570 (2007) (noting that courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines); *Rita v. United States,* 551 U.S. —, —, 127 S. Ct. 2456, 2465 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); *Cunningham v. California,* 549 U.S. —, —, 127 S. Ct. 856, 867 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines).

Under the Sentencing Reform Act, as modified by *Booker,* judges are required "to take account of the Guidelines together with other sentencing goals" when fashioning a

defendant's sentence. *Booker,* 543 U.S. at 261. As the Supreme Court recently clarified in *Gall*, "the Guidelines should be the starting point and the initial benchmark" in determining a sentence. *Gall,* 552 U.S. at —, 128 S. Ct. at 596 ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."); *United States v. Hernandez,* 518 F.3d 613, 616 (8th Cir. 2008). However, the Guidelines are not the only consideration. *Gall,* 552 U.S. at —, 128 S. Ct. at 596. "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* District courts must therefore "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough*, 552 U.S. at —, 128 S. Ct. at 570 (*quoting Booker,* 543 U.S. at 245-246); *Gall,* 552 U.S. at —, 128 S. Ct. at 596.

In doing so, however, the district court "may not presume that the Guidelines range is reasonable." *Gall,* 552 U.S. at —, 128 S. Ct. at 596; *see also Rita*, 551 U.S. at —, 127 S. Ct. at 2465 (stating that appellate courts may apply a presumption of reasonableness to a within-Guidelines sentence, but the presumption does not apply to sentencing courts). The district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines. *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 577 (Scalia, J., concurring) (stating that "any thumb on the scales," that would indicate that the "the Guidelines must be followed even where the district court's application of the § 3553(a) factors is entirely reasonable" would violate the Sixth Amendment because "the 'advisory' Guidelines would, over a large expanse of their

application, *entitle* the defendant to a lesser sentence *but for* the presence of certain additional facts found by judge rather than jury") (emphasis in original).

If the court decides that an outside-Guidelines sentence is warranted, the court must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. *Id.* The Supreme Court has rejected, however, the notion that "'extraordinary' circumstances [are required] to justify a sentence outside the Guidelines range" as well as "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.*, 552 U.S. at —, 128 S. Ct. at 595; *see also Kimbrough,* 552 U.S. at —, 128 S. Ct. at 574 (noting that a sentencing judge has greater familiarity with an individual case and an individual defendant than either the Commission or the appeals court and is therefore in a superior position to find facts and judge their import under § 3353(a) in each particular case). The district court "must make an individualized assessment" of each case "based on the facts presented." *Gall*, 552 U.S. at —, 128 S. Ct. at 596.

The Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 570. The general goals of sentencing require consideration of "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most

effective manner." 18 U.S.C. § 3553(a)(2). Also, the statute "provides that, in determining the appropriate sentence, the court should consider a number of factors, including 'the nature and circumstances of the offense,' and 'the history and characteristics of the defendant.'" *Id.*, § 3553(a)(1). The court must also consider "the kinds of sentences available," the Sentencing Guidelines and relevant policy statements, the need to avoid sentencing disparities, and the need to provide restitution to any victim. *Id.,* § 3553(a)(3)-(7).

The Guidelines were developed to advance the sentencing reform goals of reducing sentencing disparity, assuring certainty and severity of punishment, and increasing the rationality and transparency of punishment. *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing at 11-12 (Nov. 2004) (hereinafter, "Fifteen-Year Assessment"). The Sentencing Commission ("the Commission") was originally charged by Congress with developing guidelines to meet the "purposes of punishment" set out in § 3553(a)(2), and to achieve proportionality, crime control through incapacitation and deterrence, and rehabilitation. *Id.* at 12-13. Toward that end, the Commission developed and used data on past practices and recidivism in formulating the Guidelines. *See id.* at 14 (noting that the Guidelines are based in part on statistical analyses of pre-Guidelines sentencing practices); U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 567 (regarding drug trafficking guidelines). Based on sentencing statistics, the Commission established the base offense levels for each crime, linked to a recommended imprisonment range. Fifteen-Year Assessment at 14. Accordingly, in many cases, the Guidelines represent a reasonable estimation of a fair sentencing range. *See Kimbrough*, 552 U.S. at —, 128 S. Ct. at 564 (noting that in the ordinary case, the

Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives).

However, for policy reasons, and because statutory mandatory minima dictated many terms of the Guidelines, the Commission departed from past practices in setting offense levels for such crimes as fraud, drug trafficking, and child crimes and sexual offenses. Fifteen-Year Assessment at 15, 72-73; *see Kimbrough,* 552 U.S. at —, 128 S. Ct. at 567 (involving drug-trafficking crimes). Consequently, the Guideline ranges of imprisonment for those crimes are a less reliable appraisal of a fair sentence. *See Kimbrough,* 552 U.S. at —, 128 S. Ct. at 574. In cases involving application of Guidelines that do not exemplify the Commission's exercise of its characteristic institutional role—basing its determinations on "'empirical data and national experience, guided by a professional staff with appropriate expertise,'"—it is not an abuse of discretion for a district court to conclude when sentencing a particular defendant that application of the guideline will yield a sentence "greater than necessary" to achieve the purposes set out in § 3553(a). *Kimbrough*, 552 U.S. at —, 128 S. Ct. at 574-75 (*quoting United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).

The Guidelines that establish the base offense levels for murder are among those that were not based on empirical data and national experience. *See* Fifteen-Year Assessment at 47; U.S.S.G. app. C (Supp.), amends. 637 (2002); 663 (2004); 685 (2006); 699 & 700 (2007). The Commission, "either on its own initiative or in response to Congressional actions, established guideline ranges that were significantly more severe than past practice" for murder and other violent crimes. Fifteen-Year Assessment at 47 (noting that Guidelines ranges were set above historical levels for drug trafficking, white-

8

collar offenses, robbery of an individual, murder, aggravated assault, immigration, and rape). Congress did not expressly direct the Sentencing Commission to increase sentences for violent offenders. *See* 28 U.S.C. § 994(i) (directing the Commission to assure that the Guidelines specified a substantial term of imprisonment for specified categories of offenders including recidivists); *Kimbrough*, 552 U.S. at —, 128 S. Ct. at 571 (declining to read an implicit directive into Congressional silence regarding appropriate sentences within statutory ranges for crack cocaine). The Sentencing Commission acknowledges that the reason for the increased sentences was that "[w]hile not expressly directing a change in federal sentencing practices for violent offenses, the [Sentencing Reform Act] and numerous other penalty statutes display a special concern with violent crimes" and "the Commission was careful to ensure that average sentences for such [violent] crimes at least remained at current levels, and it raised them where the Commission was convinced that they were inadequate." *Id*. at 68 (stating "[f]or murder and aggravated assault, the Commission felt that past sentences were inadequate since these crimes generally involved actual, as opposed to threatened, violence."). *Id.*

At the inception of the Federal Sentencing Guidelines, the crime of second-degree murder carried a base offense level of 33. *See* United States Sentencing Commission, Guidelines Manual, § 2A1.2 (a) (Nov. 1, 1987). Voluntary manslaughter carried a base offense level of 25. *See id.*, § 2A1.3 (Nov. 1, 1987). The Guidelines for these crimes have been amended over the years. *See, e.g.,* U.S.S.G. app. C (Supp.), amends. 637 (2002); 663 (2004); 685 (2006); 699 & 700 (2007). In 2002, the Sentencing Commission added "acts of terrorism resulting in death" to the crimes subject to sentencing under the second-degree murder guideline in response to the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("the USA

PATRIOT Act") of 2001. U.S.S.G. app. C, Vol. II, amend. 637 (2002); *see* 18 U.S.C. § 2332b(a) & (c)(1)(a). In 2004, the Sentencing Commission increased the base offense level for second-degree murder to 38 "to address longstanding proportionality concerns and new proportionality issues by changes to other Chapter Two Guidelines pursuant to the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("the PROTECT Act")" and in response to "public comment that the guideline penalties for all homicides, other than for first-degree murder, were inadequate and in need of review." *Id.*, app C, Supp., amend. 663 (2004); Fifteen-Year Assessment, App. B at B-8. This reexamination was prompted, in part, by the provision of the PROTECT Act that directed the Commission to increase the base offense level for kidnapping, abduction, and unlawful restraint, and the Commission's resultant eight-level increase in the kidnapping base offense from 24 to 32. U.S.S.G. app. C, Supp., amend. 663. Because that increase brought kidnapping without injury to within one level of the base offense level for second-degree murder, the Commission examined data on second-degree murder offenses and found that courts had departed upward from the Guidelines range in 34.3% of cases in 2002. *Id.* In response to public comment expressing concern that an individual convicted of second-degree murder who accepted responsibility might serve as little as eight years' imprisonment, the Commission increased the base offense level for second-degree murder to level 38, thereby establishing "an approximate 20-year sentence of imprisonment for second degree murder." *Id.* The Commission also increased the base offense levels for the other homicide guidelines "to punish [those crimes] more appropriately and with an eye toward restoring the proportionality found in the original guidelines." *Id.*

Due to the unique nature of federal jurisdiction over violent crimes by or against Native Americans that occur on Indian land, "a sizeable proportion of murder, assault, and

especially manslaughter cases in federal court involve Native American defendants." Fifteen-Year Assessment, Executive Summary at ix.  Due to this special federal jurisdiction, Native Americans are subject to federal prosecution for many offenses, such as motor vehicle homicide or sexual assault, that are usually prosecuted in the state courts when committed by other groups. *Id.* at 114.  This jurisdictional framework "places more Native American offenders in federal court, and, when coupled with the longer federal sentences, it results in a disparate impact on Native Americans." United States Sentencing Commission, Report of the Native American Advisory Group at 28-29 (Nov. 4, 2003), accessed at http://www.ussc.gov/research.htm (noting also that the PROTECT Act will further increase the impact of federal sentences on Native Americans).  Federal courts recognize the unique sentencing considerations that are present in the prosecutions of Native Americans arising under the Major Crimes Act. *Id.* at 16; *United States v. Big Crow,* 898 F.2d 1326, 1332-33 (8th Cir. 1990) (holding, pre-*Booker*, that adverse environment of reservation life can be considered as a mitigating circumstance justifying a downward departure under the Guidelines).

## B.  ANALYSIS

### 1.  Initial Guidelines Calculation

The court adopts the findings in the PSR and finds that defendant's base offense level under the Guidelines is 38, her criminal history category is III and her sentencing range of imprisonment is 292 to 365 months.

### 2.  Departure

As discussed below, the court will grant a § 3553(a) variance.  Accordingly, the court finds an extended discussion of a departure is unnecessary.  The court notes for the record that if it were to consider a departure, the court would find that Ms. Grant's case falls

outside the heartland of cases contemplated under the Guidelines and that a departure under U.S.S.G. § 5K2.0 would be warranted in this case. Based on the evidence presented at trial, the court would also find that a departure under U.S.S.G. § 5K2.10 would be appropriate.

### 3.   18 U.S.C. § 3553(a) Factors

In consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the court finds that a sentence of fifteen years is sufficient, but not greater than necessary to accomplish the goals of sentencing. In consideration of the nature and circumstances of the offense, the court notes that the crime occurred in the course of a violent confrontation between people with a long history of such altercations. Importantly, as the result of evidentiary rulings, the jury was not presented with the evidence of Porter's substantial history of violence. That evidence is relevant to the nature and circumstances of the crime as well as to the history and characteristics of the defendant and operates to mitigate the defendant's culpability to some degree. The court finds that Porter's record of abusing Ms. Grant should be considered in mitigation of her crime.

There is substantial evidence in the sentencing record that Porter had severely injured Grant in the past. Ms. Grant had been the victim of long-term and serious abuse by Porter. Also, the court finds that the evidence shows that the incident was provoked by Porter. Although Porter's conduct may not have amounted to provocation that would cause a reasonable person to lose control, the couple's past episodes of violence would have affected the defendant's perception of danger. The court agrees with and, in any event, is bound by the jury's finding that Ms. Grant did not act in self-defense. However, the

evidence supports the finding that she had some level of subjective fear of harm during the confrontation that should be factored into the court's analysis.

At the same time, the court recognizes that Ms. Grant has a significant history of violent behavior. Not only had Porter assaulted Ms. Grant numerous times, but Ms. Grant had assaulted Porter, and numerous others, many times. Indeed, Ms. Grant may have been as much a batterer as Porter. In recognition of the defendant's proclivity for violence and aggression, the court finds the volatile relationship between Grant and Porter is both a mitigating and an aggravating factor.

Further, with respect to the nature of the crime, the court considers the distinctions between the crimes of second-degree murder and voluntary manslaughter. The government prosecuted both theories. The jury was instructed that the *mens rea* element of the crime of second-degree murder required "malice aforethought," defined as either a willful intent to take the life of a human being, or a willful intent "to act in callous and wanton disregard of the consequences to human life." The jury was instructed that Grant could be convicted of voluntary manslaughter on a finding that she intentionally caused the death of Erasmo Porter while in the heat of passion or in a sudden quarrel with adequate provocation.

Having heard the evidence presented in the trial, the court finds that Ms. Grant's crime falls right on the border of the line that separates second-degree murder from voluntary manslaughter. The evidence would support a conviction for either crime. The statutory maximum for voluntary manslaughter is fifteen years. Because it is a borderline case, the court finds that a sentence at the high end of the statutory sentencing range for

voluntary manslaughter is appropriate, as is a sentence toward the low end of the second-degree murder statutory sentencing range of zero to life.

The court also considers the fact that Ms. Grant's crime falls at the low end of the spectrum of intent required for a second-degree murder conviction. There is little evidence of any willful "intent to kill," and the evidence would support a finding that Grant may have intended only to injure Porter. Even that conduct would establish that the defendant willfully acted in callous disregard for the value of human life. The court finds that there is a qualitative difference between "willful intent to kill" and "callous disregard." The Sentencing Guidelines do not recognize that difference. The Guidelines do not provide graduated offense levels for second-degree murder, nor do they supply any specific offense characteristics from which to distinguish the levels of culpability that would correspond to each level of intent.

The court has also considered the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). Ms. Grant was sexually abused as a child and was exposed to drugs and alcohol at a young age. Both of her parents were violent alcoholics. The defendant became pregnant at age thirteen. She has nine children, fathered by seven different men. She has lost custody of all of her children. She has been involved in abusive relationships for most of her life and has been diagnosed as having polysubstance dependence, dysthymic disorder, post-traumatic stress disorder, and possible dependent personality disorder. She has had a long-standing addiction to drugs and alcohol. In connection with this analysis the court also considers the adverse impact of Native American life on the Omaha reservation.

The court has considered the Sentencing Guidelines as a factor in the § 3553(a) analysis. Because the Guidelines for Ms. Grant's conviction were not promulgated from within the confines of the Sentencing Commission's unique empirically-grounded area of expertise, they are a less reliable appraisal of a fair sentence and the court affords them less deference than it would to empirically-grounded Guidelines. The Sentencing Commission departed from empirical data on past practices in setting the original base offense levels for violent crimes and set higher base offense levels for those crimes, not in response to any explicit instruction from Congress, but to address its feeling that past sentences for violent crimes were inadequate. The base offense levels for these crimes were later substantially increased in response to concerns about terrorism and exploitation of minors, circumstances that have nothing to do with this defendant. Also, the court cannot disregard the Sentencing Commission's own admission that the Guidelines have a disparate impact on Native Americans. The result of the Sentencing Commission's focus on increasing sentences for violent crimes is that the harsh punishment for such crimes falls only on Native Americans, since they are generally the only offenders sentenced in federal court for murder, manslaughter or assault.

In connection with the need to avoid unwarranted sentencing disparities, the court notes that these crimes, if committed by a non-Native American outside a reservation, are prosecuted in state court. The court acknowledges the Sentencing Commission's finding that the Sentencing Guidelines result in longer sentences for Native Americans than they would otherwise receive. There is no way to compare sentences for non-Native Americans who commit these crimes without reference to state court sentences. The court finds no principled reason to subject this defendant to a substantially longer sentence than her state

court non-Native American counterpart would serve. Although state court sentences would not ordinarily be considered in connection with federal court sentencing, such consideration is necessary when it is the only basis on which to assess the sentencing goal of avoiding disparity. Although there are arguably situations in which the disparate impact on a group of defendants could be justified by legitimate sentencing goals that target the shared characteristics that define the group, such as recidivists, it is hard to imagine that any legitimate sentencing purpose would justify the imposition of significantly higher sentences on Native Americans by reason of their status as Native Americans.

The court finds that a sentence of fifteen years satisfies the general purposes of sentencing, including the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The length of the defendant's sentence will afford adequate deterrence to criminal conduct of this nature. Although, because of her violent history, there is arguably a need to protect the public from her future crimes, the court finds that the severity of this crime was attributable to the nature of Ms. Grant's volatile relationship with the decedent and the possibility that a similar relationship will arise when Grant is thirteen to fifteen years older is not as likely. The court's imposition of a three-year period of supervised release and stringent conditions of supervision, including drug and alcohol treatment, will also serve to protect the public in the future. This sentence also fulfills the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner by allowing Ms. Grant to receive drug and alcohol abuse treatment while incarcerated.

### III. CONCLUSION

The court finds that to sentence this defendant to the term recommended under the Guidelines, over twenty-four years at the low end, would violate the Sentencing Reform Act's overarching instruction that the court impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing. For the reasons stated above, the court finds Janice Grant should be sentenced to fifteen years' incarceration. A Judgment of Conviction in conformity with this Sentencing Memorandum will issue this date.

DATED this 16th day of June, 2008.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge